IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-30191

_____

RICHARD H. HUFNAGEL,

Plaintiff-Appellant,

versus

OMEGA SERVICE INDUSTRIES, INC.;
KERR McGEE CORPORATION; GLOBAL
INDUSTRIES LIMITED,

Defendants-Appellees.

_____

Appeal from the United States District Court for the
Western District of Louisiana

_____

July 26, 1999

Before GARWOOD, BARKSDALE and BENAVIDES, Circuit Judges.

GARWOOD, Circuit Judge:

On April 23, 1996, plaintiff-appellant Richard H. Hufnagel (Hufnagel) was injured while working on a drilling platform permanently affixed to the outer Continental Shelf off the coast of Louisiana. Hufnagel sued his employer, the platform owner, and the owner of an adjacent jack-up boat, in Louisiana state court alleging, among others, claims under the Jones Act, the general maritime law, and as to each defendant "under the Louisiana Civil

Code, Articles 2315, 2317 and 2322, for the negligence, strict liability, violations of the Coast Guard and Secretary of the Interior Regulations, non-delegable statutory duties, rules and regulations, having the force and effect of law wherein the accident occurred." He has also alleged alternative claims under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et. seq.*, and/or 33 U.S.C. § 905(B). The defendants removed the case to the district court below, and Hufnagel moved to remand. After denying remand, the district court certified its ruling on the remand motion to this Court under 28 U.S.C. § 1292(b), inquiring whether removal was prohibited by the Jones Act, and if not, whether Hufnagel has presented claims which support federal removal jurisdiction.

**FACTS AND PROCEEDINGS BELOW**

The pleadings and undisputed facts before the district court on the motion to remand reflect the following.

Defendant-appellee Omega Service Industries, Inc. (Omega), a Louisiana corporation, is an oilfield service company which contracts with offshore platform owners to construct and repair offshore oil and gas platforms. When a platform owner requests service, Omega assigns a crew of available employees based on the type of work requested. The platform owners transport or furnish transportation for the workers from the shore to the platforms, and the workers generally remain on the platform until the work is

2

complete. Sometimes, the workers sleep and eat meals on the platforms. On other occasions, the platform owner supplies a jack-up vessel to lodge the workers. Omega does not own or hire any vessels, and no Omega employees are assigned as crew members of any vessel.

Hufnagel began working for Omega in November 1994. Hufnagel worked as a rigger, and his duties typically included assisting welders and fitters. During the course of his employment with Omega, Hufnagel had been assigned to work on twenty-six different fixed platforms, for thirteen different customers. These assignments ranged from one day to twenty-seven days. Hufnagel was never permanently assigned to any particular customer or platform.

At the time of his injury, Hufnagel was working on a platform owned by defendant-appellee Kerr-McGee Corp. (Kerr-McGee), which was permanently affixed to the outer Continental Shelf off the coast of Louisiana. Hufnagel and other Omega employees had been assigned to repair pilings located on the platform. Kerr-McGee had contracted with defendant-appellee Global Industries, Ltd. (Global), a Louisiana corporation, to provide a vessel (the AMBERJACK), which was used as a temporary work station and a hotel where the workers ate and slept. Global supplied its own crew for the AMBERJACK. Although Hufnagel claims to have spent a majority of his working hours aboard the AMBERJACK, Hufnagel had no duties regarding the maintenance, custody, or operation of the vessel.

Hufnagel, a citizen of Louisiana, sued Omega, Kerr-McGee, and

3

Global in Louisiana state court.  Hufnagel's state court petition alleges:

"2.

 At all pertinent times herein, the petitioner, RICHARD H. HUFNAGEL, was an employee of OMEGA, INC.

3.

 On or about April 23, 1996, the petitioner, RICHARD H. HUFNAGEL, was working in the course and scope of his employment when he was severely injured.  The petitioner was working on a scaffold erected onto a piling of a fixed platform located at Ship Shoal 239B, said platform believed to be owned by KERR MCGEE CORPORATION, located off the coast of the State of Louisiana on the outer-continental shelf.

4.

 While attempting to repair the aforesaid piling, the petitioner was struck in the face by a chain and/or hook fixed to a come-a-long which was being used in the course of repair of the piling."

Hufnagel's state court pleading further alleged that the AMBERJACK was "owned and operated by Global," and that he was a member of the crew of the AMBERJACK, and was hence entitled to bring a claim under the Jones Act.  Additionally, Hufnagel raises claims under maritime law and the Louisiana Civil Code, made surrogate federal law by application of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et. seq.* (OCSLA).

The defendants removed the case to federal court, asserting, *inter alia*, that the Jones Act claim was fraudulently pled. Hufnagel moved for remand, arguing that Jones Act cases are not removable.  The district court concluded that the undisputed

4

evidence demonstrated that as Hufnagel was not a seaman he had no arguable Jones Act claim and therefore the Jones Act did not bar removal. The court found that Hufnagel had stated a claim against Kerr-McGee arising under the OCSLA, thus supporting removal jurisdiction under 28 U.S.C. § 1441(a) & (b). Therefore, the court denied Hufnagel's motion to remand despite the absence of complete diversity and the fact that two of the three defendants are Louisiana citizens. We hold that the district court correctly denied the motion to remand.

## DISCUSSION

### I. The Jones Act

"As a general rule, . . . Jones Act cases are not removable." *Burchett v. Cargill, Inc.,* 48 F.3d 173, 175 (5th Cir. 1995); 46 App. U.S.C. § 688 (incorporating general provisions of Federal Employers' Liability Act, including 28 U.S.C. § 1445(a), which bars removal). However, "'defendants may pierce the pleadings to show that the Jones Act claim has been fraudulently pleaded to prevent removal.'" *Burchett*, 48 F.3d at 175, quoting *Lackey v. Atlantic Richfield Co.,* 990 F.2d 202, 207 (5th Cir. 1993). A fraudulently pleaded Jones Act claim does not bar removal. *See id.* While a district court should not pre-try a case to determine removal jurisdiction, the court may use a "summary judgment-like procedure" to dispose of the assertion that the Jones Act claim was fraudulently pleaded. *See Burchett,* 48 F.3d at 176. The court may

5

deny remand where, but only where, resolving all disputed facts and ambiguities in current substantive law in the plaintiff's favor, the court determines that the plaintiff has no reasonable possibility of establishing a Jones Act claim on the merits. *Id.*

The district court correctly held that the undisputed evidence establishes that Hufnagel was not a seaman and hence could not recover under the Jones Act. To maintain a cause of action under the Jones Act, the plaintiff must be a seaman. Land-based workers are not seamen. *See Harbor Tug and Barge Co. v. Papai*, 117 S.Ct. 1535, 1540 (1997).

The Supreme Court has established a two-part test to determine seaman-status:

> "First . . . an employee's duties must contribute to the function of the vessel or to the accomplishment of its mission . . .
>
> "Second, and most important for our purposes here, a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature." *Harbor Tug*, 117 S.Ct. at 1540 (quoting *Chandris, Inc. v. Latsis,* 115 S.Ct. 2172, 2179 (1995)) (citations and internal quotation marks omitted).

The requirement that a seaman have a substantial connection to a vessel or identifiable fleet of vessels serves to distinguish sea-based workers whose employment regularly exposes them to "the perils of the sea," from primarily land-based workers who have only sporadic or tangential connections to navigation. *See Harbor Tug*,

6

117 S.Ct. at 1540. Therefore, seaman-status is determined by the employee's entire employment-related connection to a vessel, and not by the immediate circumstances or location of the plaintiff's injury. *See Chandris*, 115 S.Ct. at 2187 ("[C]ourts should not employ a ‹snapshot' test for seaman status, inspecting only the situation as it exists at the instant of injury; a more enduring relationship is contemplated in the jurisprudence.") (internal quotation marks and citation omitted).

Hufnagel claims to have been a crew member of the AMBERJACK, entitling him to bring a Jones Act claim.[1] However, Hufnagel was an employee of Omega, which neither owned nor controlled any vessel. The AMBERJACK, owned and controlled by Global, came with its own crew, supplied by Global. Global was hired by Kerr-McGee, not Omega. In his deposition, Hufnagel was not able even to identify these AMBERJACK crew members or their responsibilities.[2]

---

[1] It is clear that the fixed platform on which Hufnagel was working when he was injured was not a vessel. Such platforms are legally man-made islands, not vessels, and Hufnagel does not contend otherwise. *See generally Rodrigue v. Aetna Casualty and Surety Co.*, 89 S.Ct. 1835 (1969) (holding injuries occurring on fixed platforms not within admiralty jurisdiction). *See also, e.g., Lormand v. The Superior Oil Co.*, 854 F.2d 536, 540 (1987) (finding worker who spent majority of working hours aboard platform was not a seaman); *Barrett v. Chevron U.S.A., Inc.*, 781 F.2d 1067, 1076 (5th Cir. 1986) (same).

[2]     "Q. Global is the company that supplied the
        boat crew; is that correct?
        A. Yes.
        Q. And that was comprised of a captain; –
        A. Yes.
        . . .

Hufnagel concedes that no Omega employee was involved with the navigation of the AMBERJACK, and that the Omega employees and AMBERJACK crew had separate duties, although the Omega employees may have assisted to position the vessel over the platform.[3] Furthermore, Hufnagel does not allege, and no facts suggest, that he acted as a borrowed servant of Global or the AMBERJACK, since Global maintained no supervision or control over Hufnagel or the performance of his duties. *See Addison v. Gulf Coast Contracting Servs.,* 744 F.2d 494, 499 (5th Cir. 1984).

Hufnagel's duties in no way "contribut[ed] to the function of the vessel or to the accomplishment of its mission." *See Chandris,* 115 S.Ct. at 2184 (internal quotation marks and citation omitted). Hufnagel's duties involved platform work, and were not related to

---

Q. A crane operator; –
A. Yes.
. . .
Q. Who else was a Global employee on that jack-up barge that you can recall?
A. I believe they had an engineer and I believe they just had a couple of hands. There was a bunch of them running around. I don't know specifically what everybody did."

[3] "Q. As an employee of Omega, you didn't have any responsibilities for jacking the boat up or down, did you?
A. No, sir.
Q. Or moving that jack-up boat into position?
A. No, sir.
Q. The boat crew did that sort of thing; correct?
A. Yes. We assisted when we got to the platform to position."

the navigation, maintenance, or voyage of the AMBERJACK. Hufnagel's sole purpose for being present on the platform or the AMBERJACK related to the repair of the platform. The AMBERJACK, by contrast, was present to support the repair crew by providing lodging quarters and a work area. Hufnagel's duties as a platform worker in no way contributed to "doing the ship's work." *See McDermott, Int'l v. Wilander*, 111 S.Ct. 807, 817 (1991).

The facts that Hufnagel ate, slept, and spent time on the AMBERJACK do not make him a crew member. *See Golden v. Rowan Companies, Inc.*, 778 F.2d 1022, 1025 (5th Cir. 1985) ("The facts that Golden lived on the tender and that some of his tools and machine parts were stored there do not mean that he was permanently assigned to the tender."). Nor does the fact that Hufnagel may have performed minor duties aboard the AMBERJACK transform his position as a platform worker into that of a seaman. *See Barrett v. Chevron, U.S.A., Inc.*, 781 F.2d 1067, 1075 (5th Cir. 1986) (considering amount of time spent working on vessels during claimant's one-year employment with employer); *Longmire v. Sea Drilling Corp.*, 610 F.2d 1342, 1346 (5th Cir. 1980) (holding platform worker who was injured while assisting to stow anchor chain of tender vessel was not a seaman where he was not permanently assigned to that vessel, and work on vessel was incidental to worker's primary responsibilities).

Hufnagel did not have a substantial connection with the

AMBERJACK during the course of his employment with Omega. The Omega job on this particular fixed platform began March 28, 1996, and Hufnagel had never previously been aboard the AMBERJACK. Indeed, Hufnagel had never been aboard the AMBERJACK before April 16, 1996. Nor could Hufnagel ever expect to board the AMBERJACK during the future course of his employment. Hufnagel's connection to the AMBERJACK was only transitory and fortuitous, and does not qualify him as a seaman. *See Barrett,* 781 F.2d at 1074 ("[T]o be deemed a ‹seaman' within the meaning of the Jones Act, a claimant [must] have more than a transitory connection with a vessel or a specific group of vessels.") (internal quotation marks and footnote omitted).

Similarly, Hufnagel cannot establish a connection to any identifiable group or fleet of vessels. Over the course of his employment, Hufnagel had been assigned to work for thirteen different customers on twenty-six different platforms. Each assignment involved essentially the same platform-related services. These assignments were all short-term and none entailed a permanent assignment to any vessel. While Hufnagel and other Omega employees slept on vessels during some assignments, the vessels were always different, provided by different customers, and owned and operated by different companies. The vessels were not subject to common ownership or control. They were not an identifiable fleet of vessels for purposes of Jones Act seaman status. *See Barrett*, 781

10

F.2d at 1074 ("By fleet we mean an identifiable group of vessels acting together or under one control. We reject the notion that fleet of vessels in this context means any group of vessels an employee happens to work aboard.") (footnote omitted).

Papai, the respondent in *Harbor Tug*, had obtained short-term maintenance, longshoring, and deckhand jobs on several vessels through a union hiring hall. During the two and one-quarter years before his injury, Papai had worked for several different vessels owned by three separate employers. *See Harbor Tug*, 117 S.Ct. at 1540. After suffering injuries in the course of his employment, Papai filed a Jones Act claim, and argued that the three vessels on which he had worked were an identifiable group of vessels because Papai had been hired by each of them through the same hiring hall. *Id.* The Supreme Court noted that the "substantial connection to a vessel" criterion does not mechanically require that the worker have a connection to one single vessel. *See Harbor Tug*, 117 S.Ct. at 1540. However, a group of vessels will only qualify where it is a specific, identifiable fleet or a finite group of vessels, *subject to common ownership or control*. *Id.* at 1540, 1541. This corresponds to the Act's primary mission to protect only those employees who are "more or less permanent[ly] assign[ed]" to a vessel in navigation. *See Chandris*, 115 S.Ct. at 1290. Thus, the rule might apply where a sea-based repairman, for example, worked on several different boats from his employer's fleet. However, in

11

*Harbor Tug*, the vessels were not subject to common ownership or control. *See Harbor Tug*, 117 S.Ct. at 1540. The Court found no identifiable grouping in a series of ships which, by happenstance, had hired the same employee from a common place. *See Harbor Tug*, 117 S.Ct. at 1541.

The vessels in this case share even less of a connection to each other than did those in *Harbor Tug*. In *Harbor Tug*, the vessels had each hired Papai from one hiring hall. Here, the vessels had been hired by various companies whose only connection was that they had contracted with the same third party, Omega. This remote connection is too attenuated to qualify these vessels as "an identifiable fleet." *There was no common ownership or control of the vessels.* Indeed, there was no link whatever among them other than the coincidence that they happened to be the vessels provided as support or jack-up rigs by Omega's various customers.

The undisputed evidence reflects that as a matter of law Hufnagel was not a seaman and hence had no even arguable Jones Act claim. Therefore, remand was not required by the Jones Act.

II. Removal Jurisdiction

A. OCSLA

The absence of a valid Jones Act claim, of course, does not automatically vest jurisdiction in the district court. We must determine, therefore, whether Hufnagel's suit was removable.

12

Removal must be proper under 28 U.S.C. § 1441, which authorizes removal of cases "of which the district courts of the United States have original jurisdiction," section 1441(a), *provided* that, *apart* from cases "of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States," removal is *not* proper unless "none of the . . . defendants is a citizen of the State in which such action is brought."[4]

We hold that removal was proper because of the Outer Continental Shelf Lands Act, 42 U.S.C. § 1331 *et. seq.* (OCSLA).

OCSLA provides, in pertinent part, that "[t]he subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition. . . ." 43 U.S.C. § 1332(a). The district courts of the United States have jurisdiction over claims "arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or

---

[4] It is settled that general maritime claims do not "arise under the Constitution, treaties, or laws of the United States" for purposes of original federal question jurisdiction under 28 U.S.C. § 1331 and an admiralty action filed in state court under the savings to suitors clause, 28 U.S.C. § 1333(1), is not removable solely because as an admiralty action it could have initially been filed in federal court; but removal of such an action is nevertheless possible if federal jurisdiction is based on something other than admiralty, such as diversity or a statutory provision. *See Tennessee Gas Pipeline v. Houston Casualty Insurance Company*, 87 F.3d 150, 153 & ns.5&6 (5th Cir. 1996). Here there is no diversity.

production of the minerals, of the subsoil and seabed of the outer Continental Shelf. . . ." 43 U.S.C. § 1349(b)(1).

Congress enacted OCSLA to provide a federal body of law to govern operations on the outer Continental Shelf. *See Rodrigue v. Aetna Casualty and Surety Co.*, 89 S.Ct. 1835 at 1837 (1969) ("The purpose of the Lands Act was to define a body of law applicable to the seabed, the subsoil, and the fixed structures such as those in question here on the outer Continental Shelf."). OCSLA is exclusively federal law. However, recognizing that the statutory federal law may in some areas be inadequate, OCSLA incorporates aspects of the laws of adjacent states, where those laws are not inconsistent with OCSLA. These incorporated state laws become "surrogate federal law," and are considered exclusively federal law when applicable under OCSLA. 43 U.S.C. § 1333(a)(2)(A).[5] *See Rodrigue*, 89 S.Ct. at 1838 ("It is evident from this [legislative

---

[5] Section 1333(a)(2)(A) provides in relevant part:

"To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, *the civil* and criminal *laws of each adjacent State*, now in effect or hereafter adopted, amended, or repealed *are hereby declared to be the law of the United States for* that portion of the subsoil and seabed of the outer Continental Shelf, and *artificial islands and fixed structures erected thereon*, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf . . . . All of such applicable laws shall be administered and enforced by the appropriate officers and courts of the United States." (Emphasis added).

14

history] that federal law is ‹exclusive' in its regulation of this area, and that state law is adopted only as surrogate federal law.").

Hufnagel's petition does not plead OCSLA *eo nomine*. But it does expressly plead that the "fixed platform" is located, and the events occurred, "on the outer continental shelf." Furthermore, Hufnagel sues Kerr-McGee under the Louisiana Civil Code, which, *inter alia*, provides for strict liability for the ruinous condition of a structure.[6] There is nothing which would make Kerr-McGee's platform or its condition subject to Louisiana law other than OCSLA, which incorporates this Civil Code provision as "surrogate federal law." Hufnagel's petition also generally alleges against Kerr-McGee unspecified "violations of the Coast Guard and Secretary of the Interior Regulations . . . having the force and effect of law wherein the accident occurred," apparently referring to the platform. This presumably refers to regulations issued under the authority of OCSLA. *See* 43 U.S.C. § 1333 (d)(1) ("[t]he Secretary of the Department in which the Coast Guard is operating shall have authority to promulgate . . . regulations . . . relating to the promotion of safety of life and property on the artificial islands,

---

[6]    Hufnagel's petition alleges that Kerr-McGee is liable to him by virtue of "strict liability for the ruinous condition of the platform's piling, pursuant to LA Civil Code Article 2322." *See Haas v. Atlantic Richfield*, 799 F.2d 1011, 1012-1014 (5th Cir. 1986). Hufnagel's petition also alleges, among other things, that Kerr-McGee "failed to provide" him "with a safe place within which to work."

15

installations, and other devices referred to in subsection (a) . . . .)."  Finally, Hufnagel has consistently acquiesced in the defendants-appellees' characterization of his suit as including OCSLA claims.  We therefore interpret Hufnagel's complaint to assert claims under OCSLA.

We apply a broad "but-for" test to determine whether a cause of action arises under OCSLA.  *See Recar v. CNG Producing Co.*, 853 F.2d 367, 369 (5th Cir. 1988).  In *Recar*, we held that OCSLA applied to a personal injury suit brought by a platform worker when a rope from which he was swinging on the platform broke, causing him to fall on the deck of an adjacent transport vessel.  The worker's employment furthered mineral development on the outer Continental Shelf, and "but for" that employment the worker would not have been injured.  Therefore, the federal court had original jurisdiction over Recar's claims.  *Id.*

Similarly, Hufnagel's employment furthered mineral production on the shelf.  Hufnagel's injuries occurred on a stationary drilling platform involved in the "exploration, development, or production" of minerals on the shelf.  *See* 43 U.S.C. § 1349(b)(1). But for Hufnagel's work on the platform, his injury would not have occurred.  Hufnagel's injuries arose out of an operation involving the production of minerals on the shelf, and his claims fall within the jurisdictional grant of the OCSLA.  Therefore, the district court would have had jurisdiction over Hufnagel's claims had he

16

chosen to file them in federal court. *See also Tennessee Gas Pipeline v. Houston Casualty Ins. Co.*, 87 F.3d 150, 154-55 (5th Cir. 1996).

However, OCSLA does not necessarily transform maritime claims falling within its jurisdictional grant into claims arising under federal law. Because OCSLA does not displace general maritime law, substantive maritime law continues to govern where both OCSLA and general maritime law could apply. *See Smith v. Penrod Drilling*, 960 F.2d 456, 459 (5th Cir. 1992) ("When an event occurs on an OCSLA situs but also is governed by maritime law, maritime law controls.") (citation omitted).[7] Moreover, maritime cases do not "arise under" federal law for purposes of federal removal jurisdiction. *See Tennessee Gas Pipeline v. Houston Casualty Ins. Co.*, 87 F.3d 150, 153 (5th Cir. 1996), and note 4, *supra*. Therefore, where a claim within OCSLA's grant of original federal

---

[7]     We stated in *Tennessee Gas Pipeline*, 87 F.3d at 154:

"While OCSLA was intended to apply to the full range of disputes that might occur on the OCS, it was not intended to displace general maritime law. . . . According to the statute, 'this subchapter shall be construed in such a manner that the character of the waters above the outer Continental Shelf as high seas and the right to navigation and fishing therein shall not be affected.' [quoting 43 U.S.C. § 1332(2)] Furthermore, 43 U.S.C. § 1333(f) makes clear that the applicability of OCSLA law under 43 U.S.C. § 1333(a) shall not give rise to any inference that other provisions of law (such as general maritime law), do not also apply. It is not surprising, therefore, that this court has declared that where OCSLA and general maritime law both could apply, the case is to be governed by maritime law." (Footnotes omitted).

17

court jurisdiction is nevertheless governed by maritime law, it arguably does not provide removal jurisdiction unless no defendant is a citizen of the state of suit, notwithstanding that it would fall within the federal district court's original jurisdiction under OCSLA. As previously noted, the federal removal statute allows defendants to remove civil actions originally filed in state court, if the federal district court would have had original jurisdiction over the plaintiff's action. 28 U.S.C. § 1441(a). However, section 1441(b) places a restriction on removal: While claims "arising under" federal law may be removed without regard to citizenship, "[a]ny other such action" may be removed only if no defendant is a citizen of the state in which the action was filed. 28 U.S.C. § 1441(b). Consequently, where plaintiffs have alleged maritime claims which fall within OCSLA's jurisdictional grant, some courts have held that those cases may be removed only subject to subsection 1441(b)'s restriction that no defendant may reside in the state in which the case is filed. *See, e.g., Bulen v. Hall-Houston Oil Co.*, 953 F.Supp. 141, 144-45 (E.D. La. 1997) (where admiralty and OCSLA claims overlap, substantive maritime law applies and OCSLA does not provide basis for removal); *Courts v. Accu-Coat Services, Inc.*, 948 F.Supp. 592, 595 (W.D. La. 1996) (remanding maritime claims); *Fogleman v. Tidewater Barges, Inc.*, 747 F.Supp. 348, 355-56 (E.D. La. 1990) (OCSLA cannot provide removal jurisdiction where claim is governed by maritime law).

18

*Compare Stokes v. Petroleum Helicopters*, 1997 WL 695557 (E.D. La. 1997) (not reported in F.Supp.) (holding OCSLA transformed *state* law claims into claims arising under federal law for removal purposes); *Broussard v. John E. Graham & Sons*, 798 F.Supp. 370, 374 (M.D. La. 1992) (finding diversity of citizenship irrelevant where OCSLA applied).

In *Tennessee Gas*, we noted the "conundrum" that section 1441(b) places citizenship restrictions on the removal of claims, even though citizenship is arguably irrelevant to the district court's original jurisdiction under the OCSLA. *See Tennessee Gas*, 87 F.3d at 156. However, we did not resolve the dilemma because the only defendant there, though a citizen of the same state as was the plaintiff, was *not* a citizen of the state in which the suit was brought. *See id.* (suggesting in dicta that congressional intent of OCSLA might support removal under first sentence of subsection 1441(b)).

We need not resolve this conundrum today either, as we conclude as a matter of law that Hufnagel has asserted against Kerr-McGee a non-maritime claim, a claim governed not by maritime law but by La. Civil Code § 2322, which is made applicable federal law by OCSLA, 43 U.S.C. § 1233(a)(2)(A). *See, e.g., Haas v. Atlantic Richfield*, 799 F.2d 1011 (5th Cir. 1986). Such claim is one "arising under" OCSLA within the meaning of section 1441(b) and section 1331 and hence is not subject to section 1441(b)'s

19

restriction to cases in which no defendant is a citizen of the state of suit. Indeed, for the reasons stated below we conclude that none of Hufnagel's claims against Kerr-McGee—or the other defendants for that matter—is a maritime claim.[8]

B. Not Maritime Claims

Hufnagel's claims are not maritime. To give rise to a tort claim in admiralty, an incident must have *both* a maritime situs and a connection to traditional maritime activity. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 115 S.Ct. 1043 (1995); *Sisson v. Ruby*, 110 S.Ct. 2892 (1990); *Foremost Ins. Co. v. Richardson*, 102 S.Ct. 2654 (1982); *Executive Jet Aviation, Inc. v. City of Cleveland, Ohio*, 93 S.Ct. 493 (1972). Hufnagel's claims fail both requirements.

The situs requirement or "location test" requires the plaintiff to show that the tort either occurred on navigable waters, or if the injury is suffered on land, that it was caused by a vessel on navigable waters. *See Grubart*, 115 S.Ct. at 1048; 46 App. U.S.C. § 740. Hufnagel's accident, which occurred on an off-shore fixed drilling platform, did not occur on navigable waters. *See, e.g., Rodrigue,* 89 S.Ct. at 1839-40 (drilling platforms are not within admiralty jurisdiction); *Smith*, 960 F.2d at 459 ("Drilling platforms constitute ⟨artificial islands' under section

---

[8] Even if one of the other claims might be characterized as maritime, it too would be removable under section 1441(c).

20

1333(a)(1)."). Fixed drilling platforms do not exist for any purpose related to traditional maritime navigation or commerce. For this reason, the Court has compared fixed platforms to piers, jetties, bridges, and ramps running into the sea, which have not supported the application of maritime law. *See Rodrigue*, 89 S.Ct. 1839-1840 ("[The platform] was an island, albeit an artificial one, and the accidents had no more connection with the ordinary stuff of admiralty than do accidents on piers.").

Further, the accident was not caused by any vessel on navigable waters. Neither Hufnagel nor the platform nor any equipment involved was struck by a vessel. Hufnagel was struck by equipment attached to the platform, which is not a navigable vessel. *See Rodrigue*, 89 S.Ct. at 1840 ("The legislative history of the Lands Act makes it clear that these structures were to be treated as island or as federal enclaves within a landlocked State, not as vessels."). Thus, the accident fails the location test.

The accident also fails the connection test. The connection test requires that the activity which caused the plaintiff's injury bear a significant relationship to traditional maritime commerce. *Id.* The court must determine whether the general character of the activity giving rise to the accident bears a "substantial relationship with traditional maritime activity." *See Grubart*, 115

S.Ct. at 1048 (internal quotation marks and citation omitted).[9] The key inquiry is whether the allegedly tortious activity is "so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand." *See Grubart*, 115 S.Ct. at 1051.

The activity giving rise to Hufnagel's accident may be characterized as the repair and construction of a fixed offshore drilling platform. Construction work on fixed offshore platforms bears no significant relation to traditional maritime activity. *See Herb's Welding, Inc. v. Gray*, 105 S.Ct. 1421, 1428 (1985) (finding offshore platform worker not engaged in maritime employment). *See also, e.g., Rodrigue*, 89 S.Ct. at 1841 (finding within OCSLA's legislative history "the view that maritime law was inapposite to these fixed structures."); *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1231 (5th Cir. 1985) (contract for construction of stationary drilling platform bore no direct relationship to traditional subjects of maritime law); *In Re Dearborn Marine Services, Inc.*, 499 F.2d 263, 272-276

---

[9] The connection test actually has two parts. First, the court must assess the general features of the incident giving rise to the lawsuit and determine whether that general sort of incident has a "potentially disruptive impact on maritime commerce[.]'" *Grubart,* 115 S.Ct. at 1048 (quoting *Sisson v. Ruby*, 110 S.Ct. 2892, 2896, (1990)) (internal quotation marks omitted). Second, the court must determine whether the general character of the activity giving rise to the tort has a "substantial relationship to traditional maritime activity." *Id.* Because a positive answer to the second inquiry is precluded by precedent, we do not address the first.

22

(5th Cir. 1974) (holding platform worker's death, which occurred as a result of an explosion on a platform, bore no significant relation to maritime law, despite fact that death occurred while worker was actually located on vessel in navigable waters).

Hufnagel's accident similarly occurred on a fixed drilling platform having no function in navigation, and bearing no purpose relating to traditional maritime activities. The platform existed solely to obtain minerals from the shelf. Hufnagel's accident had no greater connection to traditional maritime commerce than did the accident in *Rodrigue*.

This case is unlike the limited situations in which this Court has found off-shore drilling accidents giving rise to admiralty tort claims. *See, e.g., Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1119 (5th Cir. 1995) (en banc) (accident and injury actually occurred on jack-up vessel on navigable waters when vessel's pressure plug failed).[10]

Hufnagel's injury occurred entirely on the fixed platform and was caused entirely by his work on the platform. According to his

---

[10] *Tennessee Gas Pipeline* held (or at least assumed) that a tort claim for damages to a fixed platform caused by its being struck by a vessel in navigation due to the vessel's negligence was governed by maritime law. *See* 46 App. U.S.C. § 740. *Smith v. Penrod Drilling Corp.*, 960 F.2d 456, 459, 460 (5th Cir. 1992), involved the question whether a *contract* between the owner of a fixed platform on the outer Continental Shelf off Louisiana and the owner of a jack-up drilling vessel for services to be performed by the vessel at the platform was governed by Louisiana law or maritime law; we held maritime law applied because "'the main piece of equipment to be supplied [by the contractor] was a vessel.'"

complaint, Hufnagel was struck by a come-a-long, owned by Omega, and attached to the platform itself. The AMBERJACK's presence beside the platform in no way contributed to Hufnagel's injury. Hufnagel has failed to present any claim within the admiralty jurisdiction of the federal courts.

Hufnagel's claims are nonmaritime ones "arising under" and governed by OCSLA. Accordingly, the case may be removed without regard to the citizenship of the parties.

## CONCLUSION

The undisputed evidence shows as a matter of law that Hufnagel was not a Jones Act seaman. At the time of his injury, Hufnagel was a primarily land-based employee, and had no permanent connection to any vessel or fleet of vessels in navigation. Therefore, remand was not required by the Jones Act.

Furthermore, Hufnagel has alleged against Kerr-McGee a non-maritime claim under and governed by Louisiana law, made applicable federal law by OCSLA, and his claim is thus one arising under OCSLA for purposes of sections 1331 and 1441(b), and is hence removable without regard to the citizenship of any of the parties. If any other claims alleged were maritime, they would be removable under section 1441(c), but in any event Hufnagel alleged no maritime claim.

Accordingly, the district court correctly denied the motion to remand.

24