# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

March 7, 2016

Lyle W. Cayce
Clerk

No. 14-20589

PETROBRAS AMERICA, INCORPORATED; CERTAIN UNDERWRITERS AT LLOYD'S, LONDON AND INSURANCE COMPANIES SUBSCRIBING TO POLICY NO. B0576/JM12318,

Plaintiffs - Appellants

v.

VICINAY CADENAS, S.A.,

Defendant - Appellee

Appeals from the United States District Court
for the Southern District of Texas

Before JOLLY, JONES, and BENAVIDES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Petrobras America, Inc. ("Petrobras") and the Underwriters of its construction all-risks insurance policy ("Underwriters") sued Vicinay Cadenas, S.A. ("Vicinay"), the manufacturer of an underwater tether chain that broke just after being installed to secure the piping system for oil production from the Outer Continental Shelf of the Gulf of Mexico. When the chain ruptured, it caused the pipeline riser and related equipment to collapse to the sea floor, severing the connection between the wellhead and the surface thousands of feet above. Petrobras alleges four hundred million dollars in damage. Acting on all parties' misunderstanding that the case sounds in admiralty, the district

No. 14-20589

court granted summary judgment for Vicinay based upon the maritime law economic loss doctrine. The Underwriters then sought leave to amend their complaint, alleging, for the first time, that Louisiana law, not maritime law, applied to this dispute under the Outer Continental Shelf Lands Act ("OCSLA"). 43 U.S.C. §1333(a)(2). The magistrate judge denied the motion, and the district court affirmed that decision. We hold that the choice of law prescribed by OCSLA is statutorily mandated and is consequently not waivable by the parties. On further analysis, we also hold that the applicable law is that of the adjacent state of Louisiana, not admiralty law. *Id.* Consequently, we reverse and remand for application of Louisiana law.

## BACKGROUND

In October 2007, Petrobras contracted with Technip USA, Inc. ("Technip"), to construct five "free-standing hybrid riser" ("FSHR") systems that move crude oil from wellheads on the seabed to "Floating Production Storage and Offloading" ("FPSO") facilities on the surface of the sea. The FPSO facilities are independently moored to the seabed and store and offload, but do not transport, the production. The risers are fixed in place at the wellhead. From above, tether chains connect the upper risers to huge nitrogen-filled "buoyancy cans," which are designed to keep tension in the risers so that they will not kink and impede the flow of oil. The buoyancy cans float 660 feet beneath the water surface; their tether chains play no role in securing the FPSO facilities.

Technip subcontracted to Vicinay the manufacture of these tether chains, and Vicinay agreed to produce chains without welded-over cracks and defects. Vicinay, however, supplied chains that contained welded-over cracks. Shortly after installation in March 2011, one of the chains broke, causing the loss of the associated FSHR system, loss of use of the FPSO facility, and lost oil and gas production.

2

No. 14-20589

Petrobras and the Underwriters sued Vicinay in March 2012 in federal district court asserting negligence, products liability, and failure to warn claims. They alleged subject matter jurisdiction based on admiralty or, alternatively, under OCSLA; they did not assert that Louisiana law applied. Vicinay moved for summary judgment, arguing that it was entitled to prevail under the maritime law's economic loss doctrine announced in *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S. Ct. 2295 (1986).[1] Notably, while opposing the motion, Petrobras and the Underwriters did not contest the application of maritime law; in fact, they moved to add a fraud claim as an exception to the economic loss doctrine. The district court, assuming that maritime law applied, granted summary judgment to Vicinay in August 2014 but also granted the motion to amend. Both parties filed interlocutory appeals of the district court's order. Only the Underwriters added a fraud claim.

Approximately two months later, the Underwriters filed another motion for leave to amend and asserted for the first time that Louisiana law, not maritime law, applied to this dispute under OCSLA. The magistrate judge denied the Underwriters' motion for untimeliness and lack of good cause. The district court affirmed the magistrate judge's ruling and denied the motion, provoking another appeal by the Underwriters. All of the parties' appeals have been consolidated before us.

---

[1] The economic loss doctrine, distinguishing tort from contract law in admiralty cases, disallows recovery of tort damages to the product itself. *See East River*, 476 U.S. at 871-74, 106 S. Ct. at 2302-04.

No. 14-20589

## DISCUSSION

We review *de novo* a district court's decision to grant summary judgment. *Grand Isle Shipyard*, *Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 783 (5th Cir. 2009) (en banc). We consider two issues on appeal.[2] The first issue is whether the Underwriters waived their OCSLA choice of law argument by failing to raise it until after summary judgment was granted on the merits. The second is whether, under OCSLA, maritime law or Louisiana law, the law of the state adjacent to the OCSLA situs, applied.[3]

### I.    Waiver

As a threshold matter, Vicinay argues that the Underwriters waived their choice of law argument by not raising it in the district court until the eleventh-hour motion to amend their complaint, which was filed after summary judgment was granted. Vicinay contends that the Underwriters confuse OCSLA subject-matter jurisdiction, which is conferred on federal courts in 43 U.S.C. § 1349(b)(1)(A) and cannot be waived, with OCSLA choice of law, 43 U.S.C. §1333(a), which allegedly can be waived and therefore should not be raised for the first time on appeal. It is Vicinay that is confused.

There is no dispute that, as Petrobras and the Underwriters originally pled, OCSLA provides a basis for subject matter jurisdiction in this case. The incident occurred on the Outer Continental Shelf, and the statutory grant of subject matter jurisdiction over cases and controversies "arising out of or in connection with" operations involving resource exploitation on the Shelf is

---

[2] The parties raise two additional issues:  (1) assuming that maritime law applies to this dispute, whether the district court erred in its application of the *East River* economic loss doctrine; and (2) whether the district court abused its discretion in denying the Underwriters' motion for leave to amend.  In light of our conclusions, the first issue is irrelevant, and the second issue is moot.

[3] We consider this choice of law issue because it is alleged that Louisiana state law does not apply the economic loss doctrine.

4

straightforward and broad.  43 U.S.C. § 1349 (b)(1)(A);  *See, e.g.  EP Operating Ltd. P'ship v. Placid Oil Co.,* 26 F.3d 563, 569 (5th Cir. 1994).  Although federal courts may have jurisdiction pursuant to OCSLA, however, "they must then turn to the OCSLA choice of law provision to ascertain whether state, federal, or maritime law applies to a particular case."  *In re DEEPWATER HORIZON,* 745 F.3d 157, 164 (5th Cir. 2014).  OCSLA's choice of law provision asserts federal jurisdiction over the subsoil and seabed of the Outer Continental Shelf, over all "artificial islands," and over installations and devices used in the exploitation of offshore resources, "other than a ship or vessel."   43 U.S.C. §1333(a)(1).  In the following subsection, OCSLA adopts as surrogate federal law the "civil and criminal laws of each adjacent State" to govern the aforementioned areas (generally speaking) "[t]o the extent that [State laws] are applicable and not inconsistent . . . with other Federal laws and regulations . . . ."  43 U.S.C. §1333(a)(2)(A).

Vicinay's argument that the OSCLA provisions are waivable runs headlong into this court's precedents rejecting parties' ability to make a "litigation choice" between maritime and adjacent state law.  *In re DEEPWATER HORIZON,* 745 F.3d at 165 n.7; *see also Alleman v. Omni Energy Servs. Corp.*, 580 F.3d 280, 283 n.2 (5th Cir. 2009) ("parties cannot choose to be governed by maritime law when OCSLA applies").  Because OSCLA's choice of law scheme is prescribed by Congress, parties may not voluntarily contract around Congress's mandate.  *Texaco Exploration & Production, Inc. v. AmClyde Engineered Prods. Co., Inc.*, 448 F.3d 760, 772 n.8 (5th Cir. 2006); *see also Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1050 (5th Cir. 1990) ("We find it beyond any doubt that OCSLA is itself a Congressionally mandated choice of law provision requiring that the substantive law of the adjacent state is to apply even in the presence of a choice of law provision in the contract to the contrary.").

Further, the Supreme Court has held that Section 1333(a) "supersede[s] the normal choice of law rules that the forum would apply." *In re DEEPWATER HORIZON*, 745 F.3d at 166 (citing *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 480-81 (1981)).  If parties cannot choose to avoid Congress's choice of law provision under OCSLA, then *a fortiori* the provision cannot be waived by failure to raise the issue below.  Vicinay's reliance upon *Fruge v. Amerisure Mutual Insurance Co.*, 663 F.3d 743, 777 (5th Cir. 2011), is misplaced.  Although that decision upheld waiver of a choice of law argument not raised in the district court, the case did not involve a statutorily mandated choice of law.  Because Congress has delineated among admiralty, federal law and adjacent state law in OCSLA, the parties may not avoid, whether voluntarily or inadvertently, the statutory choice.  The Underwriters' choice of law argument is not waived.

## II.    Admiralty or State Law under OCSLA

As has been noted, the OCSLA prescribes the applicability of either maritime law or adjacent state law as "surrogate federal law" to govern the Outer Continental Shelf.  *Hufnagel v. Omega Serv. Indus., Inc.,* 183 F.3d 340, 349 (5th Cir. 1999).  These regimes are alternative, not overlapping.  *In re DEEPWATER HORIZON*, 745 F.3d at 166; *Baker v. Hercules Offshore, Inc.*, 713 F.3d 208, 218 (5th Cir. 2013); *Tenn. Gas Pipeline v. Hous. Cas. Ins.*, 87 F.3d 150, 154 (5th Cir. 1996) (noting that OCSLA "was not intended to displace general maritime law").

The Underwriters and Petrobras contend that the district court was required to apply Louisiana law, the law of the adjacent state, while Vicinay argues that maritime law applies to the dispute.  This court has interpreted the statute to compel borrowing adjacent state law if three conditions are met: "(1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures permanently or temporarily attached thereto).

(2) Federal maritime law must not apply of its own force.  (3) The state law must not be inconsistent with Federal law."  *PLT Eng'g*, 895 F.2d at 1047 (construing §1333(a)(2)(A)).

The decisive question thus becomes whether maritime law "applies of its own force," based on the twin tests of location and connection with maritime activity.  *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 534, 115 S. Ct. 1043, 1048 (1995).  The location prong asks whether the incident occurred on "navigable waters" or, if injury occurred on land, whether it was caused by a vessel on navigable waters.  *In re La. Crawfish Producers*, 772 F.3d 1026, 1029 (5th Cir. 2014).  The court must consider where the wrong "took effect" rather than the locus of the tortious conduct.  *Id.* (citing *Egorov, Puchinsky, Afanasiev & Juring v. Terriberry, Carroll & Yancey*, 183 F.3d 453, 456 (5th Cir. 1999) (per curiam)).

Under the connection test, the incident giving rise to the alleged tort must be analyzed at an intermediate level of generality by "assess[ing] the general features of the type of incident involved."  *Grubart,* 513 U.S. at 534, 115 S. Ct. at 1048 (citing *Sisson v. Ruby*, 497 U.S. 358, 363, 110 S. Ct. 2892, 2896 (1990)).  Further, the court must consider whether the general character of the activity giving rise to the plaintiff's injury is substantially related to traditional maritime activity.  *Id.*  We address each test in turn.

**A. Location Test**

The Underwriters argue that the location test is not met, principally because the tether chain connected the floating buoyancy can to the riser, which in turn was affixed to the seabed.  Under the specific terms of OCSLA, adjacent state law should apply—to the exclusion of admiralty law—to these "fixed structures erected" on the subsoil and seabed.  43 U.S.C. §1333(a)(2)(A). This is a significant argument. *Cf. Hufnagel,* 183 F.3d at 351-52 (location test not met where plaintiff was struck by a chain and hook while engaged in

repairs on a fixed offshore drilling platform).[4]  The critical distinction between *Hufnagel* and this case, of course, is that the tether chain failed deep in the waters of the Gulf of Mexico, whereas the injury to the plaintiff in *Hufnagel* occurred on the deck of a drilling platform and not on or in the sea.  Thus, it can be argued that the tortious activity here "took effect" in navigable waters with the severance of the riser string.  *See In re La. Crawfish Producers*, 772 F.3d at 1029.  We do not address this prong further, however, because the breaking of the tether chain fails the admiralty connection test.

### B. Connection Test

Vicinay argues that the connection test is satisfied because maritime commerce was disrupted by the tether chain's failure, and that failure was "substantially related to traditional maritime commerce."  Further, Vicinay reinforces its substantial relationship contention by noting that the FPSO is a vessel and the tether chain and buoyancy can are "unique to the maritime world and do not exist on land-based operations."  We disagree.

To show disruption of maritime commerce, Vicinay points out that Petrobras had to suspend all oil and gas development operations in the area to investigate the cause of the chain's failure.  The Supreme Court has cautioned, however, that the type of incident involved must not be defined at too high or too low a level of generality; instead the question is "whether the incident could be seen within a class of incidents that posed more than a fanciful risk" to maritime commerce.  *Grubart*, 513 U.S. at 538-39, 115 S. Ct. at 1051.  The proper focus is on "potential effects, not the 'particular facts of the incident.'"  *Id.* at 538, 115 S. Ct. at 1051.  Cases from the Supreme Court and this circuit interpret potential disruption of maritime commerce in terms of the incident's

---

[4] Far less persuasive, however, and without legal support is the Underwriters' broader contention that the incident did not occur on "navigable waters" because it took place more than 660 feet below the Gulf of Mexico.

effect on the navigability of the waterways. *See, e.g., id.* at 539, 115 S. Ct. at 1051 (noting that damage to an underwater freight tunnel may imperil "the water course itself," and "navigational use" could be restricted during repair); *Sisson*, 497 U.S. at 362, 110 S. Ct. at 2896 (a fire on a noncommercial vessel in a marina may disrupt maritime commerce because the fire "can spread to nearby commercial vessels or make the marina inaccessible to such vessels"); *In re La. Crawfish Producers*, 772 F.3d at 1029 (maritime commerce would be disrupted by the "obstruction of water flows" in Louisiana's Atachafalaya Basin caused by dredging activities).

Here, expressed in general terms, a component failed on an underwater structure in an offshore production installation and caused the structure to fall to the sea floor. Such an incident does not have the potential to disrupt maritime commercial or navigational activities on or in the Gulf of Mexico. Vicinay's emphasis that Petrobras halted its development operations for some period following the failure of the FHSR erroneously relies on the "particular facts of the incident," *Grubart*, 513 U.S. at 538, 115 S. Ct. at 1051, rather than general maritime and commercial activity. Moreover, the disruption affected oil and gas production and development activities rather than navigation or traditional maritime commerce. Even the involvement of the FPSO, technically a vessel, is unrelated to the disruption of navigation or maritime commerce activity because the FPSO's only purpose was to store and process the oil in a fixed location for later transport. Finally, the fact that the buoyancy can eventually floated to the surface and had to be recovered provides, under the circumstances taken as a whole, no more than a de minimus potential to disrupt maritime commerce or navigation. *See id.* at 538-39, 115 S. Ct. at 1051 (more than a fanciful risk to commercial shipping is required).

Vicinay's argument that the second prong of the connection test is met is squarely foreclosed by *Texaco Exploration & Production v. AmClyde*

*Engineered Products Co., Inc.*  In *AmClyde*, Texaco brought negligence and products liability causes of action against a crane manufacturer arising from the failure of a barge-mounted construction crane that caused the deck of a production platform to collapse into the sea.  448 F.3d 760, 766 (5th Cir. 2006).  Critically, the platform was affixed to the Outer Continental Shelf.  *Id.*  This court held that the tort claims were not substantially related to traditional maritime activity because they were "inextricably connected with the development of the Outer Continental Shelf and an installation for production of resources there," and the development of resources on the Outer Continental Shelf is not a traditional maritime activity.  *Id.* at 771; *see also PLT Eng'g*, 895 F.2d at 1048 ("the principal obligation of PLT and the subcontractors was to build the gathering line and connect it to the platform and the transmission line.  These activities are not traditionally maritime.  Rather they are the subjects of oil and gas exploration.").  The *Amclyde* court distinguished *Grubart* as arising from a traditional maritime activity:  "repair or maintenance work on a navigable waterway performed from a vessel."  448 F.3d at 771 (citing *Grubart*, 513 U.S. at 540, 115 S. Ct. at 1043).

As in *AmClyde,* Petrobras's products liability, negligence, and failure to warn tort claims resulting from the failure of the tether chain are all "inextricably intertwined" with its oil and gas production and development operations on the Outer Continental Shelf.  Further, as *AmClyde* confirms, development on the Outer Continental Shelf is not a traditional maritime activity.  Contrary to Vicinay's argument, Petrobras's development of resources on the Outer Continental Shelf was not transformed into a maritime activity because it involved the use of the FPSO facility and a buoyancy can.  That the crane in *AmClyde* was mounted on a barge did not alter the conclusion that the resource development activities on a fixed production platform were not maritime in nature; so it is here, particularly because the FPSO facility was

permanently moored to the Outer Continental Shelf and was not used for transportation. Likewise, the buoyancy can simply kept tension in the risers to prevent kinks that would impede the flow of oil. The can and tether chain had nothing to do with any traditional maritime activities.

In sum, the rupture of the tether chain was neither potentially nor actually disruptive to navigation and maritime commerce, nor did it bear a substantial relation to traditional maritime activity. Maritime law does not apply of its own force. Because the other criteria of OCSLA choice of law are satisfied, Louisiana law applies to this dispute.

## CONCLUSION

In light of the erroneous adjudication based on maritime law, we **REVERSE and REMAND** for further proceedings under Louisiana law. The Underwriters' appeal of the district court's denial of its motion for leave to amend is **DISMISSED** as moot.

11