**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 00-31232
_____


RUSTY ROBERTS, individually and on behalf of their minor
children, Chase & Jarod Roberts; Sandra Roberts

                                      Plaintiffs-Appellants,

                          versus


CARDINAL SERVICES, INC.; ET AL.;

                          Defendants,

CARDINAL SERVICES, INC.; KERR-MCGEE CORPORATION, successor-in-
interest to Oryx Energy Company,

                                      Defendants-Appellees.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____
October 2, 2001
Before JOLLY, SMITH, and WIENER, Circuit Judges.

WIENER, Circuit Judge

    This maritime action was brought in district court against

Defendant-Appellee Cardinal Services, Inc. ("Cardinal") under the

Jones Act,[1] and against Defendant-Appellee Kerr-McGee Corporation

("Kerr-McGee") as successor-in-interest to Oryx Energy Company,

_____

    [1] 46 U.S.C. app. § 688.

1

under the Louisiana Civil Code's provisions governing negligence,[2] premises liability,[3] and strict liability,[4] which are incorporated by reference through the Outer Continental Shelf Lands Act ("OCSLA").[5] Suit was filed by Plaintiffs-Appellants Rusty Roberts and his wife, Sandra Roberts, individually and on behalf of their minor children (collectively "Plaintiffs") after Rusty Roberts, an employee of Cardinal, was injured while working on a stationary offshore platform owned by Oryx and subsequently acquired by Kerr-McGee.[6] The Plaintiffs now appeal the district court's grants of summary judgment dismissing their claims against Cardinal and Kerr-McGee. We affirm.

## I. Facts and Proceedings

Cardinal provides a range of services to the energy industry in Louisiana and Texas as well as in the Gulf of Mexico offshore those states. Among the oil and gas well services performed by Cardinal in those areas are wireline, electric line, plugging and abandoning ("p&a"), cementing, and pumping services, as well as acquisition and interpretation of oilfield data. Cardinal's

---

[2] La. Civ. Code Ann. art. 2315.

[3] La. Civ. Code Ann. art. 2317.1 and 2322.

[4] La. Civ. Code Ann. art. 667.

[5] 43 U.S.C. §§ 1331-56.

[6] To avoid confusion, the OCSLA defendants will be referred to throughout the balance of this opinion as "Kerr-McGee" even if, at the particular time referred to, Kerr-McGee had not yet succeeded to Oryx.

offshore services are performed on both fixed and movable facilities belonging to others as well as on board its own "liftboats."

Roberts worked for Cardinal in its p&a department from 1996 until the date of his injury in 1998, first as a p&a helper and then, following a promotion, as a p&a operator. The Kerr-McGee platform on which he was injured while helping to perform a p&a operation is located on the outer Continental Shelf in the Gulf of Mexico, off the Louisiana coast. He was injured by the accidental firing of a perforation gun attached to a wireline that was being used on the platform by the crew of which he was a member in connection with plugging a well. (A "wireline" is a continuous cable used to perform various subsurface functions in a well, including the lowering and raising of various tools, instruments, and other devices. One of the downhole tools used on a wireline is a "perforation gun," a device that originally used cartridges similar to rifle or pistol ammunition but evolved to use "shaped charges," cylinder-shaped ammunition which is cone-shaped internally and fires directionally. It is formed in layers, one a brittle compound of explosive material and the other a metal alloy. When fired by any of several methods, this bazooka-like ammunition shoots a short, concentrated stream of molten alloy or "plasma" in the direction at which the open end of the charge's conically shaped interior is aimed. Generally, perforating guns are used either early in the life of a well to fractionate ("frac") a

3

hydrocarbon-bearing formation or zone so as to commence or enhance production or, late in the life of a well or of a particular formation, to perforate casing or tubing in preparation for "squeezing" or sealing off the well or the zone to "plug and abandon" it.)

On the evening of Roberts's injury, the Cardinal crew was attempting a p&a job on the platform in question. Cardinal was responsible for all aspects of the project, Kerr-McGee having reserved only the right to observe and inspect Cardinal's work to ensure its satisfactory completion. The Cardinal crew had assembled a perforating gun, with its shaped charges aimed in a single direction, and had lowered the gun into the well on a wireline. This particular gun included an exterior sleeve and was rigged to fire when the pressure around it increased to a predetermined pounds-per-square inch (psi) level. During its initial descent down the well, the gun encountered a closed or partially closed downhole valve, so the crew reversed the downward direction of the wireline, raising it and the attached perforation gun to the top of the wellbore, close to which Roberts was standing. A valve in the well tubing below was then opened by a Cardinal employee, resulting in a sudden increase in pressure in the wellbore, which presumably caused the gun to fire.[7]

_____

[7] It is not altogether clear from the record whether the increase of pressure resulting from the opening of the valve below was the sole cause of detonation of the gun. After discussing possible ways in which the shear screws that

4

Unfortunately, the shaped charges happened to be aimed in Roberts's direction, and he was severely injured when they fired.

In their lawsuit, the Plaintiffs asserted negligence claims against Roberts's employer, Cardinal, under the Jones Act, advancing that he was a seaman. They brought negligence, premises liability, and strict liability claims against Kerr-McGee as owner of the platform, asserting responsibility under Louisiana law as incorporated by reference in the OCSLA.[8]

Cardinal filed a motion for summary judgment in which it asserted that Roberts did not have a sufficient temporal connection to a Cardinal vessel or fleet of vessels to be a Jones Act seaman. Agreeing with Cardinal as a matter of law, the district court granted summary judgment and dismissed the Plaintiffs' claims against the employer.

Kerr-McGee also filed a motion for summary judgment in which it asserted that the Plaintiffs could not prevail on any of the theories of Louisiana law that they proffered under the OCSLA. As the Plaintiffs did not oppose Kerr-McGee's summary judgment motion

---

controlled the actuation of the gun could have been sheared, however, the engineer's report concludes: "The exact cause of the premature firing may be only academic. The fundamental cause was almost certainly the sudden application of pressure to the assembly. This has been stated repeatedly in the various reports and there is no reason to doubt it." Accordingly, we will refer to the opening of the valve in the well tubing below the gun, with the resulting increase in pressure, as the cause of the gun's firing.

[8] 43 U.S.C. § 1333(a)(2)(A).

on the premises liability claims asserted under articles 2317.1 and 2322 of the Louisiana Civil Code, the court granted Kerr-McGee's motion as to those claims, and the Plaintiffs do not re-urge them on appeal.

The Plaintiffs conceded that, in its contract with Cardinal for the performance of the May 1998 p&a operation, Kerr-McGee had not retained the requisite operational control to support the imposition of liability for the allegedly negligent acts of its independent contractor, precluding recovery against Kerr-McGee vicariously for any negligence of Cardinal. The Plaintiffs therefore grounded their arts. 2315 and 667 negligence and strict liability claims against Kerr-McGee on allegations that the use of a wireline perforation gun in the p&a operation on Kerr-McGee's platform was an "ultrahazardous activity."

The district court granted Kerr-McGee's summary judgment motion and dismissed these claims after refusing to classify wireline perforation as ultrahazardous under Louisiana law because it is a common activity in the oilpatch that can be and indeed generally is performed safely. Plaintiffs timely filed a notice of appeal.

## II. Analysis

A. <u>Standard of Review</u>

We review a grant of summary judgment *de novo*, applying the

same standard as the district court.[9]  A motion for summary judgment is properly granted only if there is no genuine issue as to any material fact.[10]  An issue is material if its resolution could affect the outcome of the action.[11]  In deciding whether a fact issue has been created, we must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party.[12]

Determination whether an injured worker is a seaman under the Jones Act is a mixed question of law and fact.[13]  "If reasonable persons, applying the proper legal standard, could differ as to whether the employee was a 'member of a crew,' it is a question for the jury. ...  Nonetheless, summary judgment or a directed verdict is mandated where the facts and the law will reasonably support only one conclusion."[14]  Our review of such a mixed question is plenary.

---

[9] Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998).

[10] Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

[11] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[12] See Olabisiomotosho v. City of Houston, 185 F.3d 521, 525 (5th Cir. 1999).

[13] Harbor Tug & Barge Co. v. Papai, 520 U.S. 548, 554 (1997); Chandris, Inc. v. Latsis, 515 U.S. 347, 369 (1995).

[14] McDermott International, Inc. v. Wilander, 498 U.S. 337, 356 (1991); see also Papai, 520 U.S. at 554.

The standard for summary judgment mirrors that for judgment as a matter of law.[15] Thus, the court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence.[16] In reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached.[17]

B.    Seaman Status under the Jones Act

The district court's grant of Cardinal's motion for summary judgment was grounded in the determination that Roberts was not a seaman, and thus not eligible to recover under the Jones Act. This conclusion was based on the court's finding that Roberts did not have the requisite "substantial connection" to a vessel or an identifiable fleet of vessels under Cardinal's common ownership or control.

The Jones Act provides that "any seaman" who sustains personal injury in the course of his employment may maintain an action for damages at law, with the right of a trial by jury.[18] The Act does not define "seaman," and "therefore leaves to the courts the

---

[15] Celotex Corp., 477 U.S. at 323.

[16] Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000).

[17] Id. at 151.

[18] 46 U.S.C. app. § 688.

8

determination of exactly which maritime workers are entitled to admiralty's special protection."[19]  When Congress enacted the Longshore and Harbor Workers' Compensation Act ("LHWCA")[20] in 1927, it furnished some content to the term "seaman," albeit indirectly. The LHWCA provides a remedy for land-based maritime workers who are injured during their employment, but the Act explicitly excludes from its coverage "a master or member of a crew of any vessel."[21] In Chandris, Inc. v. Latsis, the Supreme Court reiterated that "the Jones Act and the LHWCA are mutually exclusive compensation regimes," and that the LHWCA's reference to "a master or member of a crew" is "a refinement of the term 'seaman' in the Jones Act."[22] Thus, the inquiry into seaman status for Jones Act purposes requires a determination whether the injured plaintiff is a "master or member of a crew of any vessel."

In Chandris, the Supreme Court clearly articulated the test to apply when making this determination:

> First,..."an employee's duties must 'contribut[e] to the function of the vessel or to the accomplishment of its mission.'"... Second, and most important for our purposes here, a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in

---

[19] Chandris, Inc. v. Latsis, 515 U.S. 347, 355 (1995).

[20] 33 U.S.C. § 901 et seq..

[21] Id. § 902(3)(G); see also Chandris, 515 U.S. at 355.

[22] Chandris, 515 U.S. at 355-56.

9

terms of both its duration and its nature.[23]
The purpose of the test stated by the court in Chandris and reaffirmed in Harbor Tug & Barge Company v. Papai[24] is to

> separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea.[25]

With respect to the inquiry into whether the injured worker's connection to a vessel is substantial in terms of both duration (the temporal prong) and nature (the functional prong), the Chandris Court emphasized that the test is conjunctive, stating that "we think it is important that a seaman's connection to a vessel in fact be substantial in both respects."[26]  The Chandris Court further clarified the application of the temporal prong of the test when it offered the following guidance for determining whether a plaintiff's connection to a vessel is substantial in duration:

> Generally, the Fifth Circuit seems to have identified an appropriate rule of thumb for

---

[23] Id. at 368 (quoting McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 355 (1991) (quoting Offshore Co. v. Robison, 266 F.2d 769, 779 (5th Cir. 1959))).

[24] 520 U.S. 548 (1997).

[25] Chandris, 515 U.S. at 368; see also Papai, 520 U.S. at 560; Hufnagel v. Omega Service Industries, Inc., 182 F.3d 340, 346 (5th Cir. 1999).

[26] Chandris, 515 U.S. at 371 (emphasis added).

the ordinary case: A worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act. This figure of course serves as no more than a guideline established by years of experience, and departure from it will certainly be justified in appropriate cases.... Nevertheless, we believe that courts, employers, and maritime workers can all benefit from reference to these general principles. And where undisputed facts reveal that a maritime worker has a clearly inadequate temporal connection to vessels in navigation, the court may take the question from the jury by granting summary judgment or a directed verdict.[27]

Synthesizing these refinements leads to the understanding that the plaintiff who fails to show that his connection to a vessel in navigation is substantial in duration will be precluded from recovering as a seaman under the Jones Act, and that, as a general rule, he must show this by demonstrating that 30 percent or more of his time is spent in service of that vessel.

The 30 percent floor does not change when an "identifiable group" of vessels in navigation is at issue, rather than just one vessel. In addressing the case before us in <u>St. Romain v. Industrial Fabrication and Repair Service, Inc.</u>,[28] we summarized our ruling in <u>Hufnagel v. Omega Service Industries, Inc.</u>[29] observing,

---

[27] <u>Id.</u>

[28] 203 F.3d 376 (5th Cir. 2000).

[29] 182 F.3d 340 (5th Cir. 1999).

11

> We held that Hufnagel did not qualify as a seaman because he could not establish a substantial connection to <u>either</u> a single vessel <u>or</u> to an identifiable fleet of vessels....Our decisions after <u>Bertrand</u> have reaffirmed the essential principle that to qualify as a seaman an employee must establish an attachment to a vessel <u>or to an identifiable fleet of vessels</u>.[30]

We have left no doubt that the 30 percent threshold for determining substantial temporal connection must be applied, regardless of whether one vessel or several are at issue.

Finally, the Court has constructed the framework for determining the presence of "an identifiable group of vessels." In <u>Chandris</u>, reviewing the development of the substantial connection requirement, the Court discussed our modification of the test for seaman status when more than a single vessel is involved:

> Soon after <u>Robison</u>, the Fifth Circuit modified the test to allow seaman status for those workers who had the requisite connection with an "identifiable fleet" of vessels, a finite group of vessels <u>under common ownership or control</u>.[31]

Subsequently, in <u>Papai</u>, the Court expounded further on this point:

---

[30] <u>St. Romain</u>, 203 F.3d at 379-380 (emphasis added). <u>See also</u> <u>Chandris</u>, 515 U.S. at 367 ("Since <u>Barrett</u>, the Fifth Circuit consistently has analyzed the problem in terms of the percentage of work performed on vessels for the employer in question–and has declined to find seaman status where the employee spent less than 30 percent of his time aboard ship.").

[31] <u>Chandris</u>, 515 U.S. at 366 (citing <u>Braniff v. Jackson Avenue-Gretna Ferry, Inc.</u>, 280 F.2d 523, 528 (5th Cir. 1960))(emphasis added).

12

> We...adverted to the group of vessels concept in <u>Chandris</u>. We described it as a rule "allow[ing] seaman status for those workers who had the requisite connection with an 'identifiable fleet' of vessels, a finite group of vessels under common ownership or control."...
>
> In deciding whether there is an identifiable group of vessels of relevance for a Jones Act seaman-status determination, <u>the question is whether the vessels are subject to common ownership or control</u>.[32]

For purposes of the Plaintiffs' Jones Act claims against Cardinal, the issue of seaman status turns on whether Roberts satisfied the temporal prong of the substantial connection test. The Plaintiffs insist that the district court erred in its application of the 30 percent guideline when it counted only the time that Roberts spent on Cardinal's liftboats and disregarded the time that he spent on other Cardinal vessels and on vessels owned by third parties. According to a breakdown of Roberts's work time, he spent 21.45 percent of his time in a shop on land, 37.24 percent of his time performing p&a work on platforms with no vessel involvement, 13.54 percent of his time performing p&a work on platforms with third-party vessels alongside, 24.88 percent of his time performing p&a work on platforms with a Cardinal liftboat alongside, 1.99 percent of his time in transit on Cardinal vessels,

---

[32] <u>Harbor Tug & Barge Co. v. Papai</u>, 520 U.S. 548, 556-57 (1997) (quoting <u>Chandris</u>, 515 U.S. at 366) (internal citations omitted) (emphasis added).

and .9 percent of his time performing p&a work on the CARDINAL 1, a Cardinal-owned vessel.  The district court stated that "Roberts only spent 24.88% of his time assigned to Cardinal boats."

Roberts contends that his time in transit and his time on the CARDINAL 1 should be included, and, more significantly, that the time he spent on platforms with an adjacent third-party vessel should be included as well.  If only Roberts's transit time and CARDINAL 1 time were to be added, he would still fall short of the 30 percent threshold, aggregating a total of but 27.77 percent; only if his third-party vessel time were counted would his total time on board vessels "of common ownership or control" rise above 30 percent, to 41.31 percent.[33]

The Plaintiffs contend that the work time involving third-party vessels should be counted.  They declare that the "temporal connection establishing a 30 percent rule of thumb is meant to determine whether an employee is sea-based versus land-based.  It

---

[33] We note, as did the district court, that Roberts also asserted in his deposition that three projects on which he worked for Cardinal were billed as platform jobs, but were actually performed on Cardinal liftboats.  This could indeed change the calculation, had Roberts offered some evidence other than just his own conclusional statements to counter Cardinal's evidence in the form of invoices for those jobs that do not indicate the use of a Cardinal liftboat on the jobs.  As the district court correctly noted, "[c]onclusory [sic] statements in an affidavit do not provide facts that will counter summary judgment evidence, and testimony based on conjecture alone is insufficient to raise an issue to defeat summary judgment."  Lechuga v. Southern Pacific Transportation Co., 949 F.2d 790, 798 (5th Cir. 1992) (footnotes omitted).

14

is not meant to be applied to the fleet requirement." It is generally true, as we noted above, that the fundamental purpose of the seaman-status inquiry is to separate the sea-based maritime employees who are entitled to Jones Act protection from the land-based employees who must find a remedy under the LHWCA. The Plaintiffs are flatly wrong, however, when they assert that the 30 percent guideline is not meant to be applied to the fleet requirement. Indeed, application of the 30 percent test is the very means by which a substantial temporal connection is determined, regardless whether a single vessel or a group of vessels is at issue. And, when a group of vessels is at issue, a worker who aspires to seaman status must show that at least 30 percent of his time was spent on vessels, every one of which was under his defendant-employer's common ownership or control. As recently as Hufnagel, we reaffirmed our commitment to this application of the 30 percent test, and we do so yet again today.[34]

We acknowledge Chandris's insistence that "[the 30 percent threshold] serves as no more than a guideline established by years of experience, and departure from it will certainly be justified in

---

[34] Hufnagel, 182 F.3d at 348 ("'We reject the notion that fleet of vessels in this context means any group of vessels an employee happens to work aboard.'...[A] group of vessels will only qualify where it is a specific, identifiable fleet or a finite group of vessels, subject to common ownership or control." (quoting Barrett v. Chevron, U.S.A., Inc., 781 F.2d 1067, 1074 (5th Cir. 1986) (emphasis omitted)).

15

appropriate cases."[35] We recognize as well that if all of Roberts's time aboard Cardinal-owned vessels were to be counted, he would come quite close (27.7 percent) to meeting the 30 percent requirement. Nevertheless, we do not perceive the instant case to be one that justifies an exceptional departure from the 30 percent test. In Wisner v. Professional Divers of New Orleans,[36] the Louisiana Supreme Court relied on our language in Bertrand v. International Mooring & Marine, Inc.[37] and Wallace v. Oceaneering International[38] to reverse a grant of summary judgment against a commercial diver. The Wisner court classified the diver as a seaman, despite the fact that he did not have a substantial connection to a fleet under common ownership or control, because the diver "faced regular exposure to the perils of the sea."[39] Specifically, the Wisner court concluded,

> In sum, the formulations or "tests" employed by the various courts are simply different ways to arrive at the same basic point: the Jones Act remedy is reserved for sea-based maritime employees whose work regularly exposes them to "the special hazards and disadvantages to which they who go to sea in

---

[35] Chandris, 515 U.S. at 371.

[36] 731 So.2d 200 (La. 1999).

[37] 700 F.2d 240 (5th Cir. 1983).

[38] 727 F.2d 427 (5th Cir. 1984).

[39] Wisner, 731 So.2d at 202.

16

ships are subjected."[40]

We consider the subsequent treatment by a Louisiana Court of Appeal, curtailing the Wisner opinion, to be apt. In the post-Wisner case of Little v. Amoco Production Company,[41] the state appellate court noted first that the United States Supreme Court's interpretations are controlling in matters of federal law, clearly indicating that, in any disagreement between the application in Wisner and the test adopted in Chandris and Papai, the test enunciated in the latter controls.[42] More substantively, the court of appeal posited that Wisner could be classified as falling within a "well-established exception" to the general 30 percent substantial connection requirement.[43] The exception, as defined by language in our pre-Chandris decision in Bertrand, would be that "Jones Act coverage should not be withheld because the vessels are not under the employer's common ownership or control, when claimants are continuously subjected to the perils of the sea and engaged in classical seaman's work."[44] The court of appeal in

---

[40] Id. at 205 (quoting Chandris, Inc. v. Latsis, 515 U.S. 347, 370 (1995) (citing Seas Shipping Co. v. Sieracki, 328 U.S. 85, 104 (1946) (Stone, C.J., dissenting))).

[41] 734 So.2d 933 (La. App. 1 Cir. 1999).

[42] Id. at 938.

[43] Id..

[44] Id. (quoting Bertrand v. Int'l Mooring & Marine, Inc., 700 F.2d 240, 245 (5th Cir. 1983)).

17

_Little_, still highlighting the _Wisner_ court's reliance on our language, noted that "[a] diver's work necessarily involves exposure to numerous marine perils, and is inherently maritime because it cannot be done on land. It is not, like so many offshore field occupations, an art developed in land work and transposed to a maritime setting."[45]

In _St. Romain v. Industrial Fabrication and Repair Service, Inc._, we refused to classify a p&a worker like Roberts as a seaman when he failed to establish that he had a substantial connection to an identifiable fleet of vessels.[46] This holding alone is conclusive; but if any doubt remained because Roberts's time aboard Cardinal vessels comes close to the 30 percent threshold, the _Little_ court's reconciliation of _Wisner_ with United States Supreme Court precedent extinguished that doubt as well.

Even though a professional diver is peculiarly — and totally — subject to the perils of the sea and thus may, under special circumstances, qualify as a seaman without showing the requisite degree of temporal connection, a p&a crewman, who practices "an art developed in land work and transposed to a maritime setting," cannot. The Plaintiffs have failed to demonstrate the presence of all elements of the conjunctive test for Roberts's seaman status,

---

[45] _Id._ (quoting _Wallace v. Oceaneering International_, 727 F.2d 427, 436 (5th Cir. 1983)) (emphasis added).

[46] 203 F.3d 376, 379-80 (5th Cir. 2000).

18

and their attempt to bring him within a possible exception to the rule fails. Accordingly, we see no reason to depart from our well-established rule, as reaffirmed in Hufnagel and St. Romain, that a worker who fails to show that at least 30 percent of his time is spent on vessels under the common ownership or control of his employer is precluded from recovering as a seaman under the Jones Act. We therefore affirm the district court's grant of summary judgment in favor of Cardinal.

C.  Use of Wireline Perforation Gun an Ultrahazardous Activity under Louisiana Law.

The Plaintiffs appeal the district court's grant of summary judgment in favor of Kerr-McGee, dismissing their claims for vicarious and strict liability under Louisiana Civil Code arts. 2315 and 667. They assert that the district court erred when it determined that Kerr-McGee's independent contractor, Cardinal, was not engaged in an ultrahazardous activity while using the perforating gun in conducting the p&a job for Kerr-McGee. The Plaintiffs focus particularly on the district court's refusal to include wireline perforation within the ultrahazardous category of "blasting with explosives." Agreeing that wireline perforation is not congruent with "blasting with explosives" as that term is used in art. 667, and being convinced that wireline perforation does not satisfy Louisiana's broader jurisprudential test for ultrahazardous activities, we affirm the district court's grant of Kerr-McGee's

summary judgment dismissing the Plaintiffs' claims under arts. 2315 and 667.

1.  The Article 2315 Claim.

    a. Framework

Before we proceed to analyze the Plaintiffs' negligence and vicarious liability claims against Kerr-McGee, an abbreviated review of the application of Louisiana's basic tort provision, art. 2315, appears to be in order. That article states that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."[47] Classically, a tort in Louisiana comprises art. 2315's four indispensable elements: act, damage, cause, and fault. The Louisiana Supreme Court observed in Langlois v. Allied Chemical Corp.[48] that "[f]ault is the key word in art. 2315."[49] In construing "fault" in art. 2315, Langlois further explained, the courts "[go] to the many other articles in our Code as well as statutes and other laws which deal with the responsibility of certain persons, the responsibility in certain relationships, and the responsibility which arises due to certain types of activities."[50] In particular, noted the Langlois court,

---

[47] La. Civ. Code Ann. art. 2315 (emphasis added).

[48] 249 So.2d 133 (La. 1971)(overruled by statute on other grounds).

[49] Id. at 136.

[50] Id. at 137.

20

there is "sound jurisprudential authority that liability for dangerous and hazardous activities of man flows from Civil Code Article 2315 by analogy with other Civil Code Articles."[51]

In our review of Louisiana law in Perkins v. F. I. E. Corp.,[52] we took cognizance of the Louisiana courts' adherence to the structure established in Langlois, most notably, for purposes of the instant case, the imposition of liability for ultrahazardous activities under art. 2315 by analogy to art. 667.[53]  As we also noted in Perkins, however, the Louisiana Supreme Court, in Kent v. Gulf States Utilities Co.,[54] later seemed to "cast liability for ultrahazardous activities directly upon art. 2315 alone, without relying, either directly or by analogy, on any other codal [sic] article."[55]  Referred to as absolute liability, or liability without fault, this concept is perhaps more easily understood when viewed as "legal fault" or fault supplied by law.  Thus, art. 2315's fault element is imputed, i.e., supplied by law, when designated persons elect to engage in particularly high-risk activities, even though

---

[51] Id. at 139 (citing Egan v. Hotel Grunewald Co., 55 So. 750 (1911)); see also Perkins v. F. I. E. Corp., 762 F.2d 1250, 1259 (5th Cir. 1985)(tracing the development of Louisiana law with respect to the imposition of liability under art. 2315 for conducting ultrahazardous activities).

[52] 762 F.2d 1250 (5th Cir. 1985).

[53] Id. at 1261.

[54] 418 So.2d 493 (La. 1982).

[55] Perkins, 762 F.2d at 1261.

21

they perform them lawfully, skillfully, and free of negligent or intentional fault in the usual sense.[56]  To date, the jurisprudential list of such activities includes only aerial crop dusting, storing hazardous materials, pile driving, and blasting with explosives.

### b.    Activities Ultrahazardous De Jure

Within this framework, the Plaintiffs' claims against Kerr-McGee must be analyzed against the backdrop of vicarious tort liability under Louisiana law.  A well-established general rule under Louisiana law is that a principal is not liable for the delictual or quasi-delictual offenses (torts) committed by an agent who is an independent contractor in the course of performing its contractual duties.[57]  There are, however, two equally well-established exceptions to this rule:  A principal may be liable (1) if it maintains operational control over the activity in question, or (2) if, even absent such control, the activity engaged in by the

---

[56] See, e.g., Kent v. Gulf States Utilities Co., 418 So.2d 493, 498 (La. 1982) (explaining that "liability is imposed [upon the enterpriser] as a matter of policy when harm results from the risks inherent in the nature of the [ultrahazardous] activity" even though the enterpriser may not have been "negligent in any respect").

[57] Ainsworth v. Shell Offshore, Inc., 829 F.2d 548, 549 (5th Cir. 1987), cert. denied, 485 U.S. 1034 (1988); Triplette v. Exxon Corp., 554 So.2d 1361, 1362 (La. App. 1st Cir. 1989).

independent contractor is "ultrahazardous."[58] Given the Plaintiffs' concession that Kerr-McGee did not retain the requisite operational control over Cardinal, Kerr-McGee could only be held liable in tort for damages caused to the Plaintiffs when Cardinal's wireline perforating gun discharged accidentally if that independent contractor's use of the device constituted an ultrahazardous activity and produced the injury. Thus, the dispositive question here is whether Cardinal's use of the wireline perforation gun in the p&a activity that it was performing for Kerr-McGee, being the activity that inflicted injury on Roberts, was ultrahazardous.[59]

Under Louisiana law, an activity may be ultrahazardous either as a matter of law or by classification under the test that has been created judicially. Again, activities that have been categorized in Louisiana as ultrahazardous as a matter of law are (1) storage of toxic gas, (2) crop dusting with airplanes, (3) pile driving, and (4) blasting with explosives.[60] As the Louisiana

---

[58] Ainsworth, 829 F.2d at 549-50; Triplette, 554 So.2d at 1362-63.

[59] We note Kerr-McGee's assertion that, in any case, it was not "directly engaged" in wireline perforation, as required by the test for imposing liability on the principal. As we join the district court in ruling that wireline perforation is not an ultrahazardous activity, we do not reach the question whether Kerr-McGee was engaged in the activity by virtue of its independent contractor's engagement in the activity.

[60] Kent v. Gulf States Utilities Co., 418 So.2d 493, 498 (La. 1982)(citing Langlois v. Allied Chemical Corp., 249 So.2d

Supreme Court observed in Kent v. Gulf States Utilities, each of these four undertakings is an activity that "can cause injury to others, even when conducted with the greatest prudence and care."[61]

This concept is embodied in the jurisprudential test for ultrahazardous activities that we outlined in Perkins v. F. I. E. Corp.[62] Under the Perkins test, an activity is ultrahazardous if it (1) relates to land or to other immovables; (2) causes the injury, and the defendant was directly engaged in the injury-producing activity; and (3) does not require the substandard conduct of a third party to cause injury.[63]

The Plaintiffs insist that wireline perforation is a manifestation of "blasting with explosives," and should therefore be classified as an ultrahazardous activity as a matter of law. We disagree. In Fontenot v. Magnolia Petroleum Co.,[64] the case that decreed "blasting with explosives" to be an ultrahazardous activity, the Louisiana Supreme Court reversed a judgment in favor of defendants whose geophysical exploration activities on the

---

133 (La. 1971); Gotreaux v. Gary, 94 So.2d 293 (La. 1957); Craig v. Montelepre Realty Co., 211 So.2d 627 (La. 1968); Fontenot v. Magnolia Petroleum Co., 80 So.2d 845 (La. 1955)).

[61] Kent, 418 So.2d at 498.

[62] 762 F.2d 1250 (5th Cir. 1985).

[63] Id. at 1267-68.

[64] 80 So.2d 845 (La. 1955).

24

property of one owner caused damage to the plaintiffs' homes on adjoining land. The geophysical operations involved the intentional detonation of 10-pound charges of Nitramon "S" at a depth of approximately 70 feet below the surface, and the damage to the plaintiffs' homes (including cracks in walls and ceilings, and broken cement foundations) was alleged to have resulted from the "vibrations and concussions radiating in the soil from the point of the explosions conducted by defendants."[65] The Fontenot court observed:

> It has been universally recognized that when, as here, the defendant, though without fault, is engaged in a lawful business, conducted according to modern and approved methods and with reasonable care, by such activities causes risk or peril to others, the doctrine of absolute liability is clearly applicable.[66]

Stated differently, even though the blasting may have been conducted responsibly and according to the latest accepted methods, the defendants were nonetheless accountable for any unavoidable damage that flowed from the activity.

Subsequently, in Schexnayder v. Bunge Corp.,[67] we characterized Fontenot as involving "purposeful subterranean explosions in connection with oil exploration," and approved the trial court's

---

[65] Id. at 846-47.

[66] Id. at 849.

[67] 508 F.2d 1069 (5th Cir. 1975).

25

jury instruction on ultrahazardous activities, which stated that "[a]n ultra-hazardous activity is an activity which [sic], even when conducted with the greatest of care and prudence, could cause a foreseeable harm or damage to those in the neighborhood."[68]  Thus, for over a quarter-century we have adhered to the Louisiana Supreme Court's reasoning in <u>Fontenot</u> for classifying the subsurface detonation of explosives as ultrahazardous:  Foreseeably, such an activity could cause unavoidable collateral damage to neighbors, even if conducted with due care.

Lowering a perforation gun down a well on a wireline and firing it to pierce drill pipe or tubing in an oil and gas well simply does not fit within this rubric.  In sharp contrast to the damage incurred by the neighbors in <u>Fontenot</u>, which was inflicted on structures located <u>off</u> the owners' premises by the inevitable, omni-directional underground shock waves produced by the intentional blasting <u>on</u> the owners' premises, the injuries incurred by Roberts were caused by the accidental detonation of the shaped-charge ammunition of the perforation gun, not downhole as intended but at the surface of the owner's premises, i.e., on the Kerr-McGee fixed platform.  As we have noted, a perforation gun's shaped charges fire only in the direction toward which their open, conical ends are pointed.  When conducted "according to modern and approved

---

[68] <u>Id.</u> at 1072 n.3.

methods and with reasonable care,"[69] a perforating gun is lowered down a well to a predetermined depth, is fired in one or more predetermined directions, produces a force sufficient only to pierce the tubing or casing, and, at most, a matter of but several additional inches of the adjacent formation. The firing of the shaped charges causes virtually no incidental damage to the gun or the wellbore, and no collateral damage whatsoever by way of vibrations, even to the owner's premises, much less to adjoining property, no matter how proximate.

In the unfortunate occurrence that injured Roberts, the business end of the shaped charges —— like the muzzle of a gun —— happened to be pointed in his direction at a time when the gun was at the surface rather than downhole. His severe injuries were a direct, primary result of the gun's accidental firing, not collateral damage from shock waves or vibrations. And the unintentional firing of the gun was caused by an act of man, presumably the opening of the valve, in turn causing a spike in pressure. We therefore reject the Plaintiffs' contention that the wireline perforation activity during which Roberts was injured is a variety of blasting with explosives and thus ultrahazardous as a matter of law.

    c.   <u>Ultrahazardous</u> De Facto

---

[69] <u>Fontenot</u>, 80 So.2d at 849.

27

Wireline perforation also fails to meet at least one of the three conjunctive prongs of the broader Perkins test for ultrahazardousness under Louisiana law.  The parties agree that wireline perforation of a well in connection with a p&a operation relates to land or to other immovables, and we shall assume arguendo that, through Cardinal, its independent contractor, Kerr-McGee was "directly engaged" in the wireline perforation activity even though the requisite control over Cardinal had not been retained by Kerr-McGee.[70]  Thus, we are concerned here only with the third prong of the Perkins test, whether wireline perforation is an activity that "can cause injury to others, even when conducted with the greatest prudence and care."[71]  For essentially the same reasons that distinguish the perforation activity from blasting with explosives, we hold that the former is not a manifestation of the latter.

First, there is ample evidence in the record to support the contention that wireline perforation, whether employing electrically or pressure-activated firing heads to detonate the shaped charges, can be, and indeed generally is, safely performed thousands of times a year.  There is further evidence suggesting

[70] See supra note 59 and accompanying text.

[71] Perkins v. F. I. E. Corp., 762 F.2d 1250, 1268 (5th Cir. 1985) (quoting Kent v. Gulf States Utilities Co., 418 So.2d 493, 498) (La. 1982)).

28

that when the (infrequent) accident does occur in connection with wireline perforation, it is directly traceable to human error, either in the initial choice to employ a pressure-activated device in a particular well, or in the failure correctly to follow safety procedures. These features of wireline perforation are similar to the transmission of electricity over power lines which was the challenged activity in Kent. Regarding that activity, the Kent court stated that "the transmission of electricity over isolated high tension power lines is an everyday occurrence in every parish in this state and can be done without a high degree of risk of injury."[72] The same can be said with equal certainty of wireline perforation of oil and gas wells. We therefore conclude that, unlike the stereotypical ultrahazardous activities recognized by statutes and courts of Louisiana, wireline perforation "is likely to cause damage only when there is substandard conduct on someone's part."[73] None can dispute that this declaration is applicable to the sequence of events that transpired in the instant accident; it apparently occurred when someone opened the downhole valve, which increased the pressure, causing the perforation gun to fire while it was at the surface rather than hundreds of feet down the

---

[72] Kent, 418 So.2d at 498-99.

[73] CNG Producing Co. v. Columbia Gulf Transmission Corp., 709 F.2d 959, 962 (5th Cir. 1983)(emphasis in original).

wellbore, as intended.

This position is consistent with our prior decisions. In Ainsworth v. Shell Offshore, Inc.,[74] we concluded that "drilling operations do not satisfy the third [element of the Perkins test]," holding that such activities were not ultrahazardous.[75] As observed by the district court and reiterated above, wireline perforation is performed frequently in conjunction with both enhancing the flow of oil and gas in a well and plugging and abandoning particular strata or entire wells. This comports with the intermediate appellate court's observation in Bergeron v. Blake Drilling & Workover Co., Inc.[76] that "[a] well cannot produce oil or gas unless it is perforated. Thus, perforation is an internal and indispensable element of every well."[77] Wireline perforation is therefore easily classifiable as a "drilling operation," and thus not ultrahazardous under Ainsworth.

We distinguish our holding today from the Bergeron court's holding which at first blush appears to be to the contrary. In Bergeron, a Louisiana court of appeal stated, "even if one found that perforating was not ultrahazardous[,] a finding that

---

[74] 829 F.2d 548 (5th Cir. 1987).

[75] Id. at 550.

[76] 599 So.2d 827 (La.App. 1 Cir. 1992).

[77] Id. at 840.

30

perforating is a [sic] inherently and intrinsically dangerous work is unavoidable."[78]  As the district court in the instant case correctly noted, however, the Bergeron court stopped short of classifying wireline perforation as an "ultrahazardous activity," characterizing it instead as "inherently dangerous," in the law of Louisiana a distinctly different term of art.  Here, the district court continued:

> By holding Kerr-McGee liable under article 2315 for [an] "inherently dangerous" activity, this Court would be expanding the Louisiana Supreme Court's policy behind ultrahazardous activity as announced in [Kent].  In Kent, the Louisiana Supreme Court held that the ultrahazardous activity classification "was created for the rare instances in which the activity can cause injury to others, even when conducted with the greatest prudence and care."  This Court does not find that an "inherently dangerous" activity fits within the "special category" of ultrahazardous liability.[79]

We adopt this reasoning, adding only the observation that the perforating gun in Bergeron had a firing head that was activated by electricity, not by pressure as in the instant case.[80]  In contrast to electrical firing of some perforation guns, only the external

---

[78] Id. at 839.

[79] Roberts v. Cardinal Services, Inc., 2000 WL 1300390, at *3 (E.D.La. 2000) (internal citations omitted).

[80] Bergeron, 599 So.2d at 838-39 (reporting that "[t]he gun consists of high explosives and a blasting cap to detonate the shaped cartridges").

31

application of sufficient psi of pressure can detonate a pressure-activated firing head like the one involved in Roberts's injury. Thus, the difference between an activity that is inherently dangerous and one that is ultrahazardous serves to distinguish Bergeron from the instant case, and the difference in the risk of accidental discharge between the firing devices involved in the two cases distinguishes them even further.

In summary, when we view the operable facts of the instant case in the light most favorable to the Plaintiffs as non-movants, we are satisfied that use of a wireline perforation gun in a p&a operation cannot be held to be an ultrahazardous activity, either de jure or de facto. Not only is such perforation factually distinguishable from "blasting with explosives," an actuality that would render such perforation an ultrahazardous activity as a matter of law were it not distinguishable; wireline perforation also fails to satisfy the third prong of the Perkins test, which requires the activity to be one that is likely to cause injury to others, even when conducted with the greatest prudence and care. This simply cannot be said of wireline perforation, which is conducted routinely in oilfield drilling, completing, producing, and plugging operations; and in which even the extremely infrequent accident is traceable to substandard human conduct.

The imposition of liability on a principal for acts of an

32

independent contractor is permitted only in narrow circumstances. Like the district court before us, we are not willing to increase the range of circumstances when the courts and legislature of Louisiana have not seen fit to do so.  Our pronouncement in <u>CNG Producing Co.</u> remains as true today as when it was uttered:  "We would not subject this activity to strict liability without certain directions from the Louisiana courts"[81] to which we would add, "or the Legislature."

## 2.   <u>The Article 667 Claim</u>

The Plaintiffs do not make altogether clear whether (1) they assert two completely separate and distinct strict liability claims against Kerr-McGee, one for vicarious tort liability under art. 2315, and another for ownership liability under art. 667[82]; or (2)

---

[81] <u>CNG Producing Co. v. Columbia Gulf Transmission Corp.</u>, 709 F.2d 959, 962 (5th Cir. 1983).

[82] Article 667 provides, in pertinent part:

Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him. ... [The proprietor] is answerable for damages only upon a showing that he knew or...should have known that his works would cause damage, that the damage could have been prevented ....  Nonetheless, <u>the proprietor is answerable for damages without regard to his knowledge or his exercise of reasonable care, if the damage is caused by an ultrahazardous activity.</u>  An <u>ultrahazardous activity</u> as used in this Article <u>is strictly limited to pile driving or blasting with explosives.</u>

33

they assert but one claim, in which they merely seek to analogize art. 667's strict liability for blasting with explosives on the premises with art. 2315's vicarious liability for its independent contractor's wireline perforation with the gun's shaped charges. As the district court made a discrete ruling under art. 667, however, we shall address the Plaintiffs' strict liability charge on the assumption that they asserted such a claim separately under art. 667. When we do so, we discern two distinct reasons why the Plaintiffs cannot recover under art. 667, one substantive and the other jurisdictional.

The substantive reason should by now be obvious: The foregoing analysis exhaustively demonstrates why downhole wireline perforation for either completing an oil or gas well or plugging and abandoning one does not equate with blasting with explosives. That applies with equal force when that activity is tested under the exclusive list of but two ultrahazardous activities that are exceptions under art. 667, i.e., blasting with explosives and pile driving. As wireline perforation is not a manifestation of blasting with explosives for tort law purposes in Louisiana, that very same activity cannot logically be ultrahazardous for purposes of art. 667. Therefore, injury resulting from wireline perforation operations on Kerr-McGee's premises cannot subject Kerr-McGee, as

---

La. Civ. Code Ann. art. 667 (emphasis added).

34

proprietor, to liability without fault under art. 667, so the Plaintiffs cannot prevail on their claims under that article. Thus they have failed to state a <u>cause</u> of action under that code article.

Second, the Plaintiffs have no <u>right</u> of action under art. 667; jurisdictionally, they do not have standing to sue Kerr-McGee as the "proprietor" of the platform which is not only Kerr-McGee's "estate" but is also the same immovable on which Roberts was working when he was injured. Roberts was not on adjacent or adjoining property; neither was he a "neighbor" deprived of the enjoyment of his own estate. Yet art. 667 clearly requires those elements to be present for a plaintiff to have standing to sue a "proprietor" for damages caused by even an ultrahazardous activity lawfully conducted on his immovable: The activity on the defendant's premises must damage the neighbor or the neighboring "estate."

Differing from Louisiana's tort doctrine (which is established in arts. 2315 <u>et</u> <u>seq.</u> in Book III Title V, entitled Obligations Arising Without Agreement), art. 667 appears in Book II, Title IV, entitled Predial Servitudes; specifically, in section 1, Limitations of Ownership, of Chapter 3, Legal Servitudes. The basic term, servitude, is not defined in the Civil Code but is generally understood to be an obligation owed by one "estate,"

35

referred to as the "servient estate," either to designated persons or to another estate, referred to as the "dominant estate." There are two kinds of servitudes, personal and predial.[83] "A personal servitude is a charge on a thing for the benefit of a person,"[84] of which there are but three: usufruct, habitation, and the right of use.[85] In contrast, a "predial servitude is a charge on a servient estate for the benefit of a dominant estate," which two estates must belong to different owners.[86] The two immovables that constitute the two estates — dominant and servient — need not be contiguous or within any given proximity,[87] and the predial servitude itself is an immovable, albeit incorporeal.[88]

Among predial servitudes are included (1) natural servitudes, such as drainage, (2) legal servitudes, which are those established by law, and (3) conventional servitudes, which are established by contract. Article 667 is applicable to legal servitudes and covers such obligations of neighborhood as keeping buildings in repair,[89]

---

[83] La. Civ. Code Ann. art. 533.

[84] La. Civ. Code Ann. art. 534.

[85] Id.

[86] La. Civ. Code Ann. art. 646.

[87] La. Civ. Code Ann. art. 648.

[88] La. Civ. Code Ann. art. 649.

[89] La. Civ. Code Ann. art. 660.

building projections across property lines,[90] building encroachments on adjoining property,[91] common walls,[92] and right of passage to and from an enclosed estate.[93] Article 667 is aptly titled "Limitations on use of property."

In distinguishing actions under art. 2315 on the one hand and those under arts. 667 and 668 on the other, Professor A. N. Yiannoupoulos has written

> The question arises, therefore, as to the interrelations of articles 2315, 667, and 668. Specifically, does the broadened notion of fault under article 2315 render the notion of liability without negligence under articles 667 and 668 unnecessary? It is submitted that this is not the case: the two sets of provisions may overlap in part but continue to establish distinct grounds of responsibility. Article 2315 establishes responsibility under the law of delictual obligations for all injuries to persons and property. Articles 667 and 668 establish specifically responsibility for damage to property and persons in the context of neighborhood, namely, under rules of property law. It is conceivable that liability may rest on either ground exclusively or on both cumulatively. Indeed, a plaintiff may satisfy the terms and conditions of both sets of articles and may have two distinct causes of action for a single recovery, one resting on the precepts of the law of obligations and the other on

---

[90] La. Civ. Code Ann. art. 663.

[91] La. Civ. Code Ann. art. 670.

[92] La. Civ. Code Ann. art. 673 _et_ _seq._

[93] La. Civ. Code Ann. art. 689 _et_ _seq._

precepts of the law of property; or he may have a cause of action either under article 2315 or under articles 667 and 668.[94]

Although courts and commentators disagree about the nature of the interest that a plaintiff must have to bring an action under art. 667, all appear to agree that the plaintiff must have <u>some</u> interest in an immovable near the defendant-proprietor's immovable. For example:

> *E. Who Can Bring the Action?*
>
> To be a "neighbor" one need not be an adjoining landowner; as article 651 says[,] "it suffices that they [the lands] be sufficiently near, for one to derive benefit from the servitude on the other."...<u>Because article 667 appears among those dealing with servitudes, and because article 666 provides that these servitudes are imposed by law "upon the proprietors...towards one another," it seems clear that the plaintiff must have a property interest....</u>[95]

and,

> We find that certain persons other than landowners have the requisite interest to entitle them to institute an action based on Article 667....
> <u>Because the servitude is established for the benefit of the estate</u> rather than for the owners personally, <u>those who have a</u>

---

[94] Yiannopoulos, A.N., <u>Civil Responsibility in the Framework of Vicinage: Articles 667-69 and 2315 of the Civil Code</u>, 48 Tᴜʟ. L. Rᴇᴠ. 195, 223 (1974).

[95] Stone, Ferdinand Fairfax, <u>Tort Doctrine in Louisiana: The Obligations of Neighborhood</u>, 40 Tᴜʟ. L. Rᴇᴠ. 701, 711 (1966) (emphasis added).

38

> proprietary interest in the estate as outlined
> by Professor Stone have the standing to bring
> an action under Article 667.[96]

and, again,

> We are of the further opinion that the word
> "neighbor" as used in Article 667 is
> indefinite and refers to any land owner whose
> property may be damaged irrespective of the
> distance his property may be from that of the
> proprietor whose work caused the damage.[97]

To summarize this point, art. 667 authorizes an action by a "neighbor" against the owner of an immovable ("proprietor") for damage that the neighbor suffered by virtue of an activity conducted on the proprietor's premises. To show that he is a "neighbor," and thus legally entitled (standing; right of action) to maintain an art. 667 action, a plaintiff must show some type of ownership interest in immovable property near that of the proprietor.

In completing this analysis, we note that, in 1977, Louisiana's legislature amended portions of the Civil Code pertinent to this analysis. Prior to the amendment, art. 666

---

[96] Salter v. B.W.S. Corp., 281 So.2d 764, 767-68 (La. App. 3d Cir. 1973) (emphasis added). See also Yiannopolous, supra note 94, at 206 ("Articles 667 and 668 seem to involve reciprocal duties among landowners that may be broadly regarded as servitudes imposed by law, namely, as charges laid on an estate in favor of another estate belonging to another owner.") (emphasis added).

[97] Gulf Insurance Co. v. Employers Liability Assurance Corp., 170 So.2d 125, 129 (La. App. 4th Cir. 1964).

provided that legal servitudes (including art. 667) were imposed by law "upon the proprietors...towards one another."  Following the amendment, arts. 664 and 666 were condensed to form the new art. 659,[98] which states: "Legal servitudes are limitations on ownership established by law for the benefit of the general public or for the benefit of particular persons."  This amendment on its face makes it less clear that one must have some type of immovable property interest to maintain an action under art. 667; the official revision Comment provides, however, that new art. 659 is based on art. 664 of the Louisiana Civil Code of 1870, and "does not change the law."

Nevertheless, to confirm our conclusion that there has been no change in interpretation, i.e., that the revisions did not strip away the requirement that a plaintiff have some type of immovable property interest, we turn to post-amendment court and commentator treatments of art. 667.  Our review of these serves to satisfy us that there has been no such change.  Professor Yiannopoulos still writes:

> Literally, Articles 667 and 668 apply to "proprietors," namely, landowners....By virtue of an expansive interpretation, any person assuming the position of owner, usufructuary, possessor in good or bad faith, or long term lessee, may qualify as a proprietor.... Persons that do not qualify as proprietors,

---

[98] Table 2-Derivation, La. Civ. Code Ann. Vol. 3A, p. XXIX.

> such as guests, contractors, and members of
> the public, may have a variety of remedies
> against a landowner under the law of delictual
> obligations or under Article 669, but not for
> violation of obligations established by
> Articles 667 and 668.[99]

And the courts of Louisiana continue to agree.[100]

In summary, then, the Plaintiffs are precluded both procedurally and substantively from recovering against Kerr-McGee under art. 667. Procedurally, they have no standing or right of action to sue Kerr-McGee under art. 667 as owner of the platform, an immovable that is the servient estate in this instance, because art. 667 creates obligations in favor of proprietors who are neighbors and thus enjoy the position of the dominant estate of the predial servitude of neighborliness created by this section of the Civil Code. Roberts, a non-proprietor, incurred his injuries while he was physically present on the servient estate, not on a dominant one; and his injuries resulted from the proprietor's lawful use of his estate. Conversely, none of the Plaintiffs is owed a duty by virtue of ownership or presence on an adjacent or proximate

---

[99] 4 A.N. YIANNOPOULOS, LOUISIANA CIVIL LAW TREATISE, Predial Servitudes, § 44: Proprietors and Other Persons, pp. 125-26 (2d ed. 1997).

[100] See, e.g., Dumas v. Angus Chemical Co., 728 So.2d 441, 451 (La.App. 2 Cir. 1999) (citing the above-referenced excerpt from YIANNOPOULOS, LOUISIANA CIVIL LAW TREATISE in denying that persons injured by an explosion on the premises of a fertilizer plant could recover against the plant operator under Art. 667).

41

dominant estate, and therefore they cannot ground their claims against Kerr-McGee in any aspect of predial servitudes in general or art. 667 in particular.

Substantively, the Plaintiffs are precluded from recovery under art. 667. First, they have not attempted to demonstrate —— nor could they —— that Kerr-McGee "knew or, in the exercise of reasonable care, should have known that [its] works would cause damage, that the damage could have been prevented by the exercise of reasonable care, and that [it] failed to exercise such reasonable care." Second, absent knowledge and ability to prevent, Kerr-McGee could only be answerable for damages if the injuries were caused by ultrahazardous activity which, for purposes of art. 667, is "strictly limited to pile driving or blasting with explosives."[101] And, as the district court correctly determined, use of a wireline perforating gun in the course of plugging and abandoning an oil or gas well is not a manifestation of blasting with explosives.

### III. Conclusion

Our review of the summary judgment record in this case and the legal propositions advanced by counsel in their appellate briefs and in their arguments before us, together with our consideration of the reasoning of the district court, satisfies us that the court

---

[101] La. Civ. Code Ann. art. 667.

(1) correctly applied the appropriate test in denying seaman status to Roberts in his Jones Act claim against Cardinal, and (2) correctly determined that wireline perforation, as a common and customary activity in the petroleum industry — including use in connection with plugging and abandoning oil and gas wells — is distinguishable from blasting with explosives, and is not an ultrahazardous activity for purposes of either vicarious liability and negligence under Louisiana tort law or strict liability of an owner of an immovable for damage to his neighbors under art. 667 of the Louisiana Civil Code.  The district court's grants of summary judgment in favor of Cardinal and Kerr-McGee are, therefore, AFFIRMED.